**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Kayla Brandstetter,

      Plaintiff,

vs.

Traverse Group, Inc., Legacy Retail Solutions LLC, James D. Hayes, Clint Lazenby, Dawn Blaske, and Michael Linn,

      Defendants.

Case No. _____

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

---

Plaintiff, by and through her attorneys Fabian May & Anderson, PLLP, brings this action for damages and other relief for Defendants' violations of law. Plaintiff states the following as her claims against Defendants:

## PARTIES

1.    Plaintiff Kayla Brandstetter is an individual who resides in Minneapolis, Minnesota.

2.    Defendant Traverse Group, Inc. is a for-profit corporation with a principal executive office and principal place of business in Bentonville, Arkansas.

3.    Defendant Legacy Retail Solutions LLC is a limited liability company with a principal executive office and principal place of business in Bentonville, Arkansas.

4.    Defendant James D. Hayes is an individual who resides in Rogers, Arkansas.

5.    Defendant Clint Lazenby is an individual who resides in Springdale, Arkansas.

1

6.    Defendant Dawn Blaske is an individual who resides in Oswego, Illinois.

7.    Defendant Michael Linn is an individual who resides in South Elgin, Illinois.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and complete diversity of citizenship exists between Plaintiff and Defendants.

9.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises in part under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq*.

10.    Venue is proper in the District of Minnesota under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this matter occurred in this District, including Plaintiff's work, Plaintiff's protected conduct, and the termination of Plaintiff's employment with Defendant.

## FACTUAL ALLEGATIONS

### A.    Plaintiff's Employment with the Company.

11.    Brandstetter was jointly employed by Traverse Group, Inc. and Legacy Retail Solutions LLC, (collectively the "Company") as an Account Manager from March 21, 2022, until her involuntary termination on June 16, 2025.

12.    Brandstetter worked remotely from her home in Minneapolis, Minnesota.

13.    Throughout her employment with the Company, Brandstetter was a hardworking, dedicated employee. Among her many achievements, Brandstetter

2

successfully led strategic sales efforts and client partnerships resulting in the growth of the Minneapolis Market.

14.     As a result of her outstanding work, Brandstetter received numerous positive performance reviews as well as a $30,000 merit-based salary increase.

15.     Brandstetter did not receive any formal performance or employment discipline during her employment with the Company.

### B. The Company, Hayes, and Lazenby maintain a hostile work environment permeated with sex discrimination and sexual harassment.

16.     In 2024, the Company's male Partner, David Mullican, reportedly asked other employees if they would "fuck" Brandstetter's female coworker, Catherine Moosa.

17.     Moosa since told Brandstetter that Mullican's comments made her incredibly uncomfortable – that is, that they were unwelcome.

18.     Moosa reported Mullican's sexually harassing comments to the Company's leadership, including the Company's Co-founders and Co-owners James ("JD") Hayes and Clint Lazenby.

19.     Despite Moosa's report of sexual harassment to Hayes and Lazenby, neither Hayes nor Lazenby took any remedial action to ensure that sexually harassing behavior in the workplace stopped.

20.     Moosa did everything she could, even going as far as to cancel a work trip that she was supposed to attend, to avoid Mullican's sexually harassing conduct, but the Company, Hayes, and Lazenby allowed the sexual harassment conduct to continue.

3

21.     Shortly after Moosa's reports of Mullican's harassment, she was required to attend a one-on-one call with Mullican.

22.     A male Account Manager reportedly approached the glass on the outside of Mullican's office while he was on Microsoft Teams meeting with Moosa and repeatedly thrusted his hips in a sexually suggestive manner, suggesting that either Mullican's sexually harassment of Moosa was well-known and accepted within the Company or that the  Hayes and/or Lazenby had disclosed Moosa's complaint of Mullican's sexual harassment to other employees.

23.     Upon information and belief, Moosa and other female employees continued to report sexual harassment, and neither the Company, Hayes, nor Lazenby took any remedial action in response.

24.     As a result, sexual harassment against female employees continued to permeate throughout the Company.

25.     In early December 2024, Brandstetter witnessed Mullican make sexual gestures towards another female employee, Shelbie Cross.

26.     At a Company Christmas party, Cross walked past Mullican while he was talking to other co-workers.

27.     Mullican looked at Cross as she walked by and then brought his fingers up to his mouth in a V-shape and started licking between them, a reference to performing oral sex on a woman.

28.     The Company once again took no action in response to Mullican's blatant and open sexual harassment.

4

29.     Shortly thereafter, on or around December 17, 2024, Mullican was arrested on criminal charges of first-degree stalking, residential burglary, non-financial identity fraud, first-degree terroristic threatening, harassing communications, unlawful distribution of sexual images or recordings, computer trespassing, and criminal trespassing.

30.     Upon information and belief, Mullican's arrest was based upon Mullican's stalking and harassing conduct occurring over multiple years, including sending harassing texts to a female victim, following a female victim using various tracking devices, and listening to and watching a female victim by placing hidden cameras around a female victim's home.

31.     This conduct was, of course, consistent with his sexual harassment of the Company's female employees.

32.     Only after Mullican was arrested and criminally charged for his sexually harassing conduct did Hayes and Lazenby place Mullican on administrative leave and allegedly decided to conduct an investigation into Mullican's sexually harassing conduct at work – despite the fact that female employees had reported that conduct for months.

33.     Brandstetter was disappointed to learn that the Company, Hayes, and Lazenby never addressed employees' reports of Mullican's conduct prior to his arrest, which is apparently what forced the alleged "investigation" into his conduct and eventual termination.

34.     By failing to take any remedial action despite multiple reports to stop Mullican's sexually harassing behavior at work until his arrest, Hayes and Lazenby perpetuated a hostile work environment inside the Company.

35. The Company's, Hayes's, and Lazenby's lack of concern for female employees and their failure to take prompt remedial action in response to past reports of Mullican's sexual harassment of female employees was emblematic of a larger discriminatory practice within the Company of failing to honor the rights of women.

### C. Brandstetter discloses her pregnancy, requests reasonable accommodation for her pregnancy, and Defendants offer noncommittal and noncooperative information in response.

36. On or around September 11, 2024, Brandstetter informed Hayes that she was pregnant and that she planned to take pregnancy and parental leave.

37. Hayes told Brandstetter that the Company would work with her create a plan to allow her to take leave at a later date and instructed her to discuss the details of that plan with Human Resources.

38. However, Brandstetter's relationship with the Company's leadership quickly devolved after she announced that she was pregnant.

39. Pursuant to Hayes' instruction, Brandstetter contacted the Company's Director of Human Resources, Dawn Blaske (formerly Dawn Wilson), to schedule a meeting to discuss how she could maximize her leave options while still balancing her role and to continue the success she had in building her team over the past last 3 years.

40. In or around mid to late September 2024, Brandstetter met with Blaske.

41. During that meeting, Brandstetter explained to Blaske that she was pregnant and that she wanted to develop a plan to allow her and her team to be successful while she was out on pregnancy and parental leave.

42.     Rather than expressing excitement for Brandstetter or being enthusiastic and supportive of Brandstetter's desire to create a plan to ensure that the Company was in the best position to succeed while she was on leave, Blaske shockingly asked Brandstetter how many more children she planned to have.

43.     Brandstetter honestly responded that she would like to have a couple more children. Blaske did not appear pleased with this response.

44.     Brandstetter then asked Blaske about the Company's pregnancy and parental leave policy.

45.     Blaske told Brandstetter that the Company didn't have a written policy but verbally told Brandstetter that the Company's standard policy was six weeks of leave to be paid at her base rate and for six weeks of leave to be paid at half of her base rate.

46.     Brandstetter indicated that she wanted to take the full extent of leave allowed but that she would talk with her husband before responding to Blaske.

47.     Blaske did not help Brandstetter develop a plan to ensure that her team would be in the best possible position to succeed while Brandstetter was on pregnancy and parental leave before the end of the meeting.

48.     As a result, Brandstetter was left to do so entirely on her own, without any meaningful guidance from Hayes or the Company's human resources department, including Blaske.

49.     Shortly thereafter, Brandstetter confirmed that she would be taking pregnancy and parental leave consistent with the Company's standard leave policy – that

is, for six weeks of leave to be paid at her base rate and for six weeks of leave to be paid at half of her base rate – with a tentative start date of April 1, 2025.

50.    Throughout the remaining fall months, Brandstetter proposed multiple coverage plans and strategies to ensure a smooth transition during her leave to the Company, Hayes, and Lazenby.

51.    Despite her efforts, the Company, Hayes, Lazenby, and Blaske failed to engage with Brandstetter in developing a workable coverage plan until just before her scheduled leave date.

52.    Concerned about the Company's lack of planning and its impact on her clients, Brandstetter created a comprehensive 25-page "Team Brandstetter Maternity Leave Guide" to support her team and uphold client service in her absence.

53.    Brandstetter's guide identified lead and support roles for each client, provided login credentials, detailed project trajectories, and more.

54.    In or around January 2025, Blaske requested Brandstetter attend the Company's "Annual Growth" event in Arkansas that was scheduled about two weeks after Brandstetter's anticipated return date from her pregnancy and parental leave.

55.    Brandstetter then asked Blaske if her attendance was mandatory, because she was concerned about traveling just two weeks after the anticipated end date of her pregnancy and parental leave and expected that she would be breast feeding at that time.

56.    In response, Blaske informed Brandstetter that her absence would be used as a reflection for her employee rating at the end of the year for bonus calculations –

suggesting Brandstetter's attendance was mandatory and that she would receive a lesser bonus if she took leave and not attend the Company's "Annual Growth" event in Arkansas.

57.    As a new mother Brandstetter was unfamiliar with how to preserve or provide her breast milk to her child when she was required to travel for work. Consequently, Brandstetter researched the options available to her and spoke with other female professionals outside of the Company to learn more about her options, since Blaske did not provide her with any information regarding travel accommodations while breast feeding. Brandstetter discovered a breast milk shipping service, Milk Stork, which she believed, based upon her conversations with other female professionals, was a common pregnancy-related benefit provided by other companies that required employee travel.

58.    Brandstetter asked Blaske whether the Company would provide her reasonable accommodations to allow her to preserve or ship her breast milk, such as a service like Milk Stork, when she was required to travel for work, as she was expected to for the Company's Annual Growth event.

59.    Blaske was noncommittal and stated that she would need to bring Brandstetter's request to the Company.

60.    Neither Blaske, nor anyone else at the Company, followed up with Branstetter about her request for reasonable accommodations to allow her to preserve or ship her breast milk, such as a service like Milk Stork, when she was required to travel for work thereafter.

61.    The Company's unwillingness to engage in the interactive process to assisting Brandstetter select a pregnancy and parental leave option and its failure to respond

9

to Brandstetter's reasonable request for pregnancy-related accommodations in the form of a breast milk storage or shipping service is further evidence of Defendants' discriminatory practice of failing to honor the rights of women.

### D. Brandstetter engages in protected conduct by taking pregnancy leave, and Defendants retaliate against her by terminating her employment while she is on leave.

62.    On March 26, 2025, Brandstetter began her pregnancy and parental leave.

63.    Under the terms of the Company's 12-week paid leave policy, and pursuant to her request, Brandstetter was entitled to paid time off through June 18, 2025.

64.    As a result of the Company refusing to develop a transition plan for Brandstetter's pregnancy and parental leave, there was an expectation that Brandstetter would continue working on her pregnancy and parental leave. This led to Brandstetter's clients continuing to contact her because the Company was unresponsive. Without another option, Brandstetter responded to client emails and phone calls throughout her pregnancy and parental leave.

65.    On June 11, 2025, Legacy's General Manager, Mike Linn, abruptly requested a check-in meeting with Brandstetter – despite Brandstetter still being on pregnancy and parental leave – reflecting Linn's expectation that Brandstetter would be responding to work-related emails during her leave.

66.    Since Brandstetter did not plan to have any meetings during her leave and needed to care for her newborn child, she informed Linn that she would need to have her newborn present for the meeting.

67.     On June 16, 2025, Brandstetter virtually joined the meeting with Linn and Blaske.

68.     Immediately after Brandstetter joined the meeting, Linn told Brandstetter her position was being eliminated and that her employment was terminated.

69.     Linn claimed that this decision was not based on Brandstetter's performance, but instead a "restructuring" within the Company.

70.     Brandstetter was shocked that the Company had decided to terminate her employment while she was still on pregnancy and parental leave, prior to the expiration of the 12-week leave that she had requested.

71.     While Brandstetter was still trying to process the news of her termination, her baby began to cry into the phone.

72.     Without skipping a beat, Linn callously continued to discuss Brandstetter's termination from employment with the Company.

73.     Brandstetter then asked Linn whether it was just her being terminated from the Company or whether it was her position was eliminated.

74.     Linn again claimed Brandstetter's termination was part of an alleged restructuring and reiterated their decision was not performance-based.

75.     Linn suggested that he, Hayes, Blaske, and Lazenby decided to terminate Brandstetter's employment by subsequently directing Brandstetter's concerns to them.

76.     Hayes, Lazenby, Blaske, and Linn's decision to terminate Brandstetter's employment was not the result of a restructuring, but instead a mere pretext for their

discriminatory and retaliatory animus because of Brandstetter's sex/pregnancy and her request for pregnancy and parenting leave.

77. This is supported by the fact that: sexual harassment permeated within the Company despite multiple reports from female employees for months; the Company did not engage in an interactive process to assist Brandstetter in her selection of a maternity leave plan or transition into her pregnancy and parental leave; Brandstetter was expected to answer emails and phone calls during her pregnancy and parental leave; the Company terminated Brandstetter while she was still on pregnancy and parental leave; Brandstetter was the only employee terminated as a result of the alleged "restructuring;" all other employees who had not disclosed that they were pregnant and who had not requested leave remained employed in the same or similar position.

## CAUSES OF ACTION

### COUNT I: DISCRIMINATORY DISCHARGE BECAUSE OF SEX/PREGNANCY IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT ("MHRA") (Against Traverse Group, Inc. and Legacy Retail Solutions LLC)

78. Plaintiff incorporates the above paragraphs.

79. Brandstetter is an "employee" within the meaning of Minn. Stat. § 363A.03, subd. 15.

80. The Company is an "employer" within the meaning of Minn. Stat. § 363A.03, subd. 16.

81. Under the MHRA, "it is an unfair employment practice for an employer, because of . . . sex . . . to: (2) discharge an employee; or (3) discriminate against a person

with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08 subd. 2 (2)-(3).

82.     Under the MHRA, the term "'Sex' includes, but is not limited to, pregnancy, childbirth, and disabilities related to pregnancy and childbirth." Minn. Stat. § 363A.03 subd. 42.

83.     By its conduct set forth above, the Company discharged and discriminated against Brandstetter because of her sex in violation of Minn. Stat. § 363A.08, subd. 2.

84.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer damages in excess of $75,000.

## COUNT II: REPRISAL IN VIOLATION OF THE MHRA
**(Against Traverse Group, Inc., Legacy Retail Solutions LLC, James D. Hayes, Clint Lazenby, Dawn Blaske, and Michael Linn)**

85.     Plaintiff incorporates the above paragraphs.

86.     Brandstetter is an "employee" within the meaning of Minn. Stat. § 363A.03, subd. 15.

87.     The Company is an "employer" within the meaning of Minn. Stat. § 363A.03, subd. 16.

88.     The MHRA prohibits "any individual who participated in the alleged discrimination as a perpetrator, employer, labor organization, employment agency, public accommodation, public service, educational institution… or employee or agent thereof to intentionally engage in any reprisal" because the employee engaged in protected conduct under the Minnesota Human Rights Act. Minn. Stat. § 363A.15.

13

89. "A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment." *Id*.

90. Brandstetter engaged in statutorily protected conduct by requesting reasonable accommodations, including a temporary leave of absence, for her pregnancy.

91. By their conduct set forth above, Hayes, Lazenby, Blaske, and Linn are individuals who participated in discrimination as perpetrators.

92. By their conduct set forth above, the Company, Hayes, Lazenby, Blaske, and Linn also subjected Brandstetter to reprisals because she engaged in conduct protected by the MHRA.

93. By their conduct, the Company, Hayes, Lazenby, Blaske, and Linn violated Minn. Stat. § 363A.15.

94. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer damages in excess of $75,000.

**COUNT III: FAILURE TO PROVIDE PREGNANCY AND PARENTING LEAVE IN VIOLATION OF THE MINNESOTA WOMEN'S ECONOMIC SECURITY ACT ("WESA")**
**(Against Traverse Group, Inc. and Legacy Retail Solutions LLC)**

95. Plaintiff incorporates the above paragraphs.

96. The requires employers to grant a leave of absence to an employee who is: (1) a biological or adoptive parent in conjunction with the birth or adoption of a child; or (2) a female employee for prenatal care, or incapacity due to pregnancy, childbirth, or related health conditions. Minn. Stat. § 181.941 subd. 1 (a).

14

97.    The length of the leave shall be determined by the employee, but must not exceed 12 weeks, unless agreed to by the employer. Minn. Stat. § 181.941 subd. 1 (b).

98.    On June 16, 2025, the Company terminated Brandstetter's employment – while she was still on maternity leave prior to the scheduled end date on June 18 – rather than continuing to provide her with a temporary leave of absence without speaking to her.

99.    By its conduct, the Company failed to provide Brandstetter with pregnancy and parenting leave as required by Minn. Stat. § 181.941 subd. 1.

100.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer damages in excess of $75,000.

### COUNT IV: RETALIATORY DISCHARGE IN VIOLATION OF THE WESA
### (Against Traverse Group, Inc. and Legacy Retail Solutions LLC)

101.    Plaintiff incorporates the above paragraphs.

102.    The WESA states that "An employer shall not discharge, discipline, penalize, interfere with, threaten, restrain, coerce, or otherwise retaliate or discriminate against an employee for requesting or obtaining a leave of absence as provided by this section." Minn. Stat. § 181.941, subd. 3.

103.    Brandstetter engaged in statutorily protected conduct when she requested and obtained leave because of her pregnancy and the birth of her child.

104.    The Company subjected Brandstetter to an adverse action when it terminated her employment because she requested and obtained a leave of absence for her pregnancy and the birth of her child.

105.    By its conduct, the Company violated Minn. Stat. § 181.941, subd 3.

106.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer damages in excess of $75,000.

**COUNT V: DISCRIMINTAORY DISCHARGE BECAUSE OF SEX/PREGNANCY IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED ("TITLE VII")**
**(Against Traverse Group, Inc. and Legacy Retail Solutions LLC)**

107.    Plaintiff incorporates the paragraphs above.

108.    Brandstetter was an "employee" of the Company within the meaning of 42 U.S.C. § 2000e(f).

109.    The Company was Brandstetter's "employer" within the meaning of 42 U.S.C. § 20000e(b).

110.    Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a).

111.    "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions…" 42 U.S.C. § 2000e(k).

112.    By its conduct, the Company discharged and discriminated against Brandstetter because of her sex in violation of 42 U.S.C. § 2000e-2(a).

113.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer damages in excess of $75,000.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kayla Brandstetter prays for judgment against Defendants

Traverse Group, Inc., Legacy Retail Solutions LLC, James D. Hayes, Clint Lazenby, Dawn

Blaske, and Michael Linn as follows:

A. For all relief available for Defendants' violations of the Minnesota Human Rights Act;

B. For all relief available for Traverse Group, Inc.'s and Legacy Retail Solutions LLC's violations of the Minnesota Women's Economic Security Act;

C. For all relief available for Traverse Group, Inc.'s and Legacy Retail Solutions LLC's violations of Title VII of the Civil Rights Act of 1964, as amended;

D. For punitive damages and all other damages available at law or equity;

E. For Plaintiff's costs, disbursements, and attorneys' fees; and

F. For such other and further relief that the court deems just and equitable.

Dated: February 26, 2026                **FABIAN MAY & ANDERSON, PLLP**


*/s/ Nevada S. Sweitzer*
Nicholas G. B. May #0287106
Nevada S. Sweitzer #0505644
1625 Medical Arts Building
825 Nicollet Mall
Minneapolis, MN 55402
(612) 353-3340
nmay@fmalawyers.com
nsweitzer@fmalawyers.com

**ATTORNEYS FOR PLAINTIFF
KAYLA BRANDSTETTER**

17